UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **GLOBAL MARINE SHIPPING (NO.10) LIMITED** | **CIVIL ACTION** |
| **VERSUS** | **NO.02-2570** |
| **TIDEWATER, INC., ET AL.** | **SECTION "K" (5)** |

## ORDER AND REASONS

The beginning of this saga which resulted in the sale of a vessel and ultimately this lawsuit to rescind the sale and for damages, began when one, Mr. Allan Mellor, contacted English barrister, David Jacobs about the potential charter of a vessel in Tunisian waters. Mr. Jacobs, coincidentally, was also the lawyer for Dr. Anthony Haden-Taylor and his business interests. Jacobs put the two together and the unfortunate chain of events which culminated in these proceedings began.

Mr. Allen Gick was at one time interested in the venture and was involved in a corporation, named Global Marine Services Limited . Also, Haden-Taylor and Mellor incorporated Global Offshore Services Limited ("GOS") which did business as Global Marine Services. Ultimately, GOS purchased the vessel, the subject of the matter herein, then known as the Hornbeck Snipe from Tidewater Marine (IOM) Limited ("IOM") on June 11, 1998. (P's Ex. No. 37). Apparently, the next day, June 12, 1998, GOS sold the vessel to Global Marine

1

Shipping (No.10) Limited ("No. 10").  ( P's Ex. No. 39).  No. 10 is the plaintiff in these proceedings and has sued three Tidewater entities, specifically, IOM, Tidewater, Inc., and Tidewater Marine North Sea Limited ("TMNS").  The parties submitted sixteen depositions which were read by the Court prior to trial and the trial was conducted June 16-17, 2005, and the matter taken under advisement, pending briefing by the parties.   Accordingly, the Court, having heard the testimony, and having thoroughly reviewed the record, memoranda, exhibits, and the relevant law, makes the following Findings of Fact and Conclusions of Law.  To the extent that any of the following findings of fact are deemed to be conclusions of law, then this court construes such findings as conclusions of law.

**Findings of Fact**

1. IOM sold the vessel Hornbeck Snipe, later named the Global Snipe, ("Snipe") to GOS on June 11, 1998.  The Memorandum Of Agreement for the sale contained the following "As is/Where is" clause:  "The vessel will be sold on an "as is, where is" basis, without any representations or warranties, whether express or implied, of any kind and character as respects the condition of the vessel of her class, her merchantability, or suitability for any purpose whatsoever." ( P's Ex. No. 20, ¶ 17).  The sale price was  $970,000.00 U.S. dollars.

2.  On June 12, 1998 GOS sold the vessel to No. 10.

3.  The Court finds as a fact that GOS purchased the vessel on behalf of No.10 as agent and/or nominee; that No. 10 was the real party in interest, as it was Mellor and Haden-Taylor's intent that No. 10 take title to the vessel.  Thus, No. 10 is the proper party plaintiff in these proceedings.

4.  All of the funds utilized to pay for the vessel ultimately came from interests owned and

controlled by Hayden-Taylor who had the authority to transfer the vessel from GOS to No. 10. The nominee stockholders in GOS, specifically, McIntyre and Adrisenssen did not pay the subscription for the stock and their certificates were lawfully cancelled by Haden-Taylor.

5. IOM was the seller of the Snipe to No. 10.  IOM was dissolved some time after the act of sale; Tidewater Inc. received all of the assets of IOM, as Tidewater Inc. was its sole shareholder. Prior to the sale, Tidewater, Inc. and TMNS as disclosed agents to IOM provided information concerning the Snipe to agents of No. 10 and they have been made defendants herein as the plaintiff alleges that certain material information was concealed by these defendants. Accordingly, Tidewater Inc., as distributee of IOM's assets, TMNS, and Tidewater, Inc., as disclosed agents, are appropriate defendants in these proceedings.  *See, discussion, infra*.

6. The Snipe was constructed in 1972 and went through a series of owners.  In 1991, she was acquired by SeabordOffshore, LTD, operated by Seaboard Offshore.  In 1995, Hornbeck Shipping Limited became the owner of the Snipe.  As a result of a merger which took place on March 13, 1996, a Tidewater Inc. subsidiary obtained a 49.9 % interest in a company which owned Hornbeck.  In May 1996, Tidewater subsidiary acquired the remaining 51.1 % interest in that company.   Therefore, Tidewater, Inc's subsidiary had full ownership of the company which owned the Snipe.

**7.** In May, 1998, Mr. John Harling was requested by the Global interests to inspect the Snipe which was in Grangemouth, Scotland.  Arrangements were made for Harling to meet with Mr. David Anderson on either the 13th or 14th of May, 1998.   Mr. Anderson had been familiar with the Snipe since he was first employed by Seaboard in 1993.  At the time of the inspection, he was working for TMNS, as Tidewater superintendent engineer.

8**.** Harling inspected the engine room, generators, and pumps, and the generators were started and were working; however, Anderson could not get the main engines started.  Anderson apprised Harling there were no problems with the vessel being in class, although he did say the Snipe was suspended due to minor items in the class certificate.  He told Harling there were no major defects in the engines and the hull.

9. Harling reviewed certain certificates on board the vessel and asked permission to contact Germanischer Lloyd ("GL") to obtain the latest class information which was granted.  He also asked for a copy of the latest dry-docking report.  The dry-docking report was not available at that time.

10.  The second inspection took place May 22 or 23, 1998.  The engines were started and run through the speed range for about an hour.   The engines were run at the full speed of 900 rpm's for approximately fifteen minutes.  Anderson told Harling the sale would be "As is/Where is" and it would be unfeasible to perform sea or dock trials because of manning problems and location of the vessel.

11. Harling was apprised by Anderson the main engines would not be opened up as the sale was an "as is/where is" scenario.

12.  Ultimately, Harling reviewed the dry dock report and record from GL, and Harling testified there appeared to be nothing major or drastically wrong with the vessel, as she had been given a clean bill of health in the GL ship report.

13.  However, Harling was aware that the under- piston cooling rails had been partially blanked-off, and Anderson told him that the power rating had been reinstated and the cooling rails renewed.

14.  No. 10 waived dry-docking the vessel.

15.  Ultimately, the sale of the vessel was consummated; No. 10 moved the vessel to Grangemouth for dry-docking.  During the dry-docking, they discovered among other things the vessel had been holed and the repair was by a welded doubler plate, which was a temporary repair and not a permanent repair of the hull.  Moreover, it was also noted that the Kortz-nozzles had been repaired with an elastimetric material which was not a standard repair.  Again, this was only a patch-work repair.

16.  After the dry-docking, the vessel was to sail from Scotland to Tunisia.  The vessel had to make port in New Castle with certain electric problems relating to the buzz bar.  The vessel then had to make port in Hull where it had substantial problems with her gear boxes.  Ultimately, the vessel arrived in Tunisia in September 1998.  During the course of the trip, the vessel ran between 750-800 rpm's, although there was no specific restriction on speed.

17.  While on charter in Tunisia, the vessel made several four hour round trips from the floating rig it was servicing to the port running between 800 and 900 rpm's.  During this period of time, the engines sustained a number of cracked cylinder heads.

18.  Harling and Haden-Taylor described the numerous problems it experienced after Tunisia, including, cracked cylinder heads and over heating.  Ultimately, the vessel was dry-docked at Malta and lost its charter.  While at Malta, it was discovered the vessel had been line bored to 222 mm and there is testimony, albeit, hearsay, that the cooling pistons had been blanked-off and were not renewed.  Moreover, the crankshafts in both engines were deflected, and it was ultimately decided that the engines should be condemned.  The testimony demonstrates that the line boring is 1 mm above the manufacturer's limit of 221 mm.  The Court finds that the

manufacturer Deutz did not warrant any work performed on the starboard engine. The Court also finds that the brass plate placed on the engine to notify anyone working on the engine that it had been line bored to 222 mm had been painted over.

19. The Court finds that neither the line boring nor the blanking off were in the records provided by GL and Tidewater to No. 10. The Court finds that these items should have been in the classification records given to Mr. Harling. The Court further finds that the line boring took place in 1990, and the original blanking off took place in 1994.

20. After reviewing all of the testimony, the Court finds that Deutz had some involvement with the 1990 line boring and with the 1994 blanking off. *See* Depo. of David Anderson, pgs. 15-20; Depo. of Norbert Erles,GL representative, pgs. 42-44.

21. The Court carefully listened to the testimony of Michael Fox, former Deutz Service Manager, United Kingdom. He testified that it was his opinion, based on the invoices reviewed, that the blanking off had never been renewed by Tidewater. He further testified that the line boring would have never been approved by Deutz

22. The Court has also reviewed the testimony of Hugh Craig, former Hornbeck employee, and Dennis Morrison, former Deutz mechanic. Each testified that the cooling rails had been reinstated. The Court acknowledges that the invoice for the work, showing 54 pounds for material, slightly over a 1,000 pounds for labor is certainly insufficient as to the material. However, the Court cannot discount the direct testimony of Craig and Morrison. Moreover, the Court notes that the salvage association surveyor which took place in Malta does not mention any blanking off of cooling rails. (D's Ex. No. 58). The Court also notes that the D's Ex. No.64 and/or D's Ex. No. 266 does not mention blanking off. The Court further notes that there is no

direct testimony that the cooling rails were not blanked off; there is specific testimony they were were reinstated. The Court finds as a fact that plaintiff has not met its burden of proof that the cooling rails were not reinstated. Moreover, the minutes of the meeting held at Deutz in Cologne on June 21, 2000 taken by Dr. Haden-Taylor does not mention the under piston-cooling rails. (D's Ex. No. 85).

23. After reviewing all of the evidence, the Court finds that the only record of any line boring is in 1990, prior to Tidewater owning the vessel. The Court notes that no one observed the line boring brass plate until 2000 in Malta after substantial repair work and engine disassembly had taken place. Obviously, the plate was obscured; but there is no sufficient evidence that Tidewater knew that the line boring was beyond the manufacturer's limits. It is also significant that the starboard crankshaft was not as significantly damaged as the crankshaft in the port engine, although the starboard crankshaft had been line bored.

24. Additionally, the Court found credible the testimony of Mr. Luukas, the expert of Tidewater, who testified the crankshaft of the starboard engine in 2000 was the same crankshaft that was in the starboard engine of 1990, indicating that no further line boring had occurred. The Court found credible Luukas' testimony that the crankshaft replaced in 1990 was the reconditioned shaft. He also based his opinion on the letter from GL confirming this. (D's Ex. No. 258, Appendix 4).

25. Therefore, the Court finds there was only one line boring which took place in 1990. Plaintiff has not met its burden that Tidewater was aware on June 11, 1998 that the line boring was in excess of 221 mm.

26. Although the holing of the vessel's hull and the make-shift repair of the Kortz-nozzles were

raised during discovery during depositions, the Complaint was never amended to urge these as grounds for rescission. Discovery was not conducted on costs or the materiality of these alleged defects. Notwithstanding plaintiff's argument that these alleged defects were sufficiently raised, the Court finds that these alleged defects are not sufficiently material to be actionable under English law. There was no showing by the plaintiff that the cost to repair the holing of the vessel's hull and the Kort-nozzles would be substantial in relation to the purchase price. *See The Law of Contract*–G.T. Treitel (11th Ed.) pg.770, D's Post-Trial Reply Brief, Exhibit B. Furthermore, the testimony by Mr. Harling was equivocal at best on materiality and cost.

**Conclusions of Law**

1. The Court finds that defendant Tidewater, Inc. as sole shareholder and distributee of IOM inherits both its assets and liabilities. Thus, claims against IOM, as seller, are properly brought against Tidewater, Inc. The Court looks to Louisiana Revised Statute 12:142.1(A) which provides that after a corporation has been dissolved, "the shareholders, or the incorporator if no shares have been issued, shall be personally liable for any debts or claims, if any, against the corporation in proportion to their ownership in the shares of the corporation." *See also*, *Great Lakes Dredge and Dock Co v. Settoon*, 1995 WL 92342 (E.D.La.)(holding that the dissolution statute makes shareholders liable for corporation's debts after dissolution). The Court finds that after IOM's dissolution, Tidewater Inc. is the proper party defendant for claims under the Memorandum of Agreement. (P's Ex.No.20).

2. The claims against Tidewater, Inc., as distributee, under the MOA are limited to intentional misrepresentation, concealment, or another form of fraud. As stated by this Court in its prior Minute Entry, "[a]ccordingly, under English law according to Brenton, the aforementioned

portions of the MOA would operate to prevent liability by Tidewater for defects in the condition or class of the vessel, except in the case of **intentional misrepresentation**, **concealment**, or **another form of fraud**.  In other words, the 'as is, where is' and 'without representation or warranties' portions of the MOA provided the vessel was sold without implied warranties.  Thus, according to Brenton, plaintiff must prove that defendant concealed or misrepresented the condition of the vessel in order to recover."  *See*,  Minute Entry, dated August 26, 2004, Rec. Doc. 56; *see also*, Rec. Doc. 35, Exhibit 12, Legal Opinion of English barrister Timothy Brenton.

3.  The Court also finds plaintiff has a cause of action against Tidewater, Inc. and TMNS as disclosed agents.  The Court looks to *Barrie v. V.P. Exterminators, Inc.,* 625 So.2d 1007, 1016 (La. 1993) wherein the Louisiana Supreme Court found a termite inspector had a duty to use reasonable care and competence in obtaining and ascertaining facts and communicating those facts to the buyer in a wood destroying inspect report under La. Civ. Code 2315 and 2316, even though there was no privity of contract or direct or indirect contact by utilizing a case by case duty/risk analysis.  The Court stated: "The obligation for the liability is imposed by law based upon policy considerations due to the tortfeasor's knowledge of the prospective use of the information which expands the bounds of his duty of reasonable care to encompass the intended user." *Id*.  *See also*, Brenton Opinion, page 12, 39(b): "[A] party may exclude liability for the fraudulent acts of a servant or agent, such an intention would need to be expressed in clear and unmistakable terms–which the present clause does not."  Brenton in providing an explanation of the phrase "the vessel will be sold without any representations or warranties" contemplates the liability of agents.  Thus, the Court finds that a duty exists as to Tidewater, Inc. and TMNS.

4.  The Court finds English law applies to claims against disclosed agents, Tidewater, Inc. and TMNS.  Plaintiff argues that federal law under maritime jurisdiction or Louisiana law should apply to the claims against the disclosed agents.  The Court disagrees for the reasons stated in the Court's August 26, 2004 Minute Entry (Rec. Doc. 56) and for the reasons given herein.  The Fifth Circuit in *Grigson v. Creative Artists Agency, L.L.C., Et al.*, 210 F.3d 524, 529 (5th Cir.2000) affirmed a district court's decision allowing non-signatory defendants to compel arbitration of plaintiff's claim against non-signatories on grounds that the action was intertwined with, and dependent upon, agreement which contained arbitration clause.  *See also*, *Roby v. Corporation of Lloyd's*, 996 F.2d 1353, 1361 (2nd Cir.1993)(holding that forum selection provision to apply English law applied to all of plaintiff's claims arising from the contract);  *see also, P.T. Adimitra Rayapratama v. Bankers Trust Co.*, 1995 WL 495634 at *4(S.D.N.Y)("[T]he contract is the basic source of the claims by [plaintiff], and there is no evidence suggesting that the choice of law clause was not intended to apply to all claims growing out of the contractual relationship.").  Therefore, plaintiff's claims based on Louisiana law, such as negligent misrepresentation, redhibition, shall not be considered.

5.  As an alternative holding, the Court holds that plaintiff's tort claims under Louisiana law against Tidewater, Inc. and TMNS, as disclosed agents, are prescribed.  Defendants pled the defense of prescription in its Answer.   If the Court were to determine that Louisiana law is applicable to plaintiff claims against disclosed agents, La. Civ. Code Art. 3492 provides that "[d]ilectual actions are subject to a liberative prescription of one year." *See also*, La. Civ. Code Art. 2534.  In order to determine the date when prescription begins to run, the Louisiana Supreme Court states:

> The damage suffered must at least be actual and appreciable in quality–that is, determinable and not merely speculative. (citation omitted). But there is no requirement that the quantum of damages be certain or that they be fully incurred, or incurred in some particular quantum, before the plaintiff has a right of action. (citation omitted). Thus in cases in which a plaintiff has suffered some but not all of his damages, prescription runs from the date on which he first suffered actual and appreciable damage, (citations omitted), even though he may thereafter come to a more precise realization of the damages he has already incurred or incur further damage as a result of the completed tortious act.

*Harvey v. Dixie Graphics*, 593 So.2d 351, 354 (La. 1992).

Plaintiff contends that in May of 2000 when the ship entered Malta for major overhaul of her main engines, two further conditions of the vessel were discovered: the main bearing pocket of her starboard main engine had been line bored to 222mm and the under piston cooling rail systems of both main engines had been blanked off and rendered inoperative. ¶ 30 Plaintiff's Proposed Findings of Fact and Conclusions of Law. Prescription began to run at least from this point in time, as plaintiff points out that alleged defects were discovered prior to this time. Plaintiff filed suit in August 2002; thus, plaintiff's tort claims brought under Louisiana law against disclosed agents are prescribed.

Accordingly, based on the findings of facts and conclusions of law herein,

**IT IS ORDERED** that Global Marine Shipping (No.10) Limited's claims against Tidewater, Inc., Tidewater Marine (IOM) Limited, and Tidewater Marine North Sea Limited are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that **JUDGMENT** will be rendered in this matter.

New Orleans, Louisiana, this   12th   day of August, 2005.

_____
**STANWOOD R. DUVAL, JR.**
**UNITED STATES DISTRICT COURT JUDGE**